UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DONALD A. GREEN,  )
 )
        Plaintiff,  )
 )
vs.  )   07 C 5107
 )
BOARD OF EDUCATION OF  )
COMMUNITY UNIT SCHOOL  )
DISTRICT NO. 201,  )
 )
        Defendant.  )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on the motion of Defendant Board of Education ("Board") of Community Unit School District No. 201 ("District") for summary judgment on the complaint of Plaintiff Donald Green. For the reasons set forth below, the motion is granted.

## BACKGROUND

Green is an African-American man who was employed as a math teacher at Westmont High School during the 2006-2007 school year.[1] Westmont is located within

---

[1] The factual recitation contained herein is derived from documents attached to the undisputed facts set forth in the parties' Rule 56.1 statements of material fact and facts that are admitted by operation of Local Rule 56.1. See *Ammons v. Aramark*
(continued...)

the District.  Before going to Westmont, Green had taught at the high school level for four years.  He was the only African-American among approximately 40 teachers employed at the school that year.  The District's superintendent was Steven Baule, who was responsible for recruiting teachers and making recommendations to the Board regarding the renewal of teachers' contracts.  Steve Carr was Westmont's principal; Nancy Bartosz-Thompson served as the assistant principal.  Carr's duties included assessing school staffing needs and recruiting, interviewing, supervising, and evaluating staff.  Carr was responsible for supervising and evaluating Green.

Carr conducted both of Green's evaluations.  In the fall, Green's work was given a rating of "Excellent," the product of twelve "Excellent" and twelve "Satisfactory" ratings in the 24 evaluative criteria.  Green's spring evaluation stated that his performance was "Satisfactory" in 16 criteria and "Excellent" in the other eight, for an overall rating of "Satisfactory."

Full-time teachers at Westmont are on probationary status for four years before they become eligible for tenure, pursuant to Illinois law. 105 ILCS 5/24-11.  During the four-year probationary period, teachers are evaluated in writing once per semester by

---

[1](...continued)
*Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). We have disregarded any facts asserted in the parties' statements of material fact that are unsupported by the record. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

an observing administrator who gives each teacher a summative rating of unsatisfactory, satisfactory, or excellent. However, the Board has the sole authority to renew or not renew a probationary teacher's contract, a decision made in the spring. Prior to the Board's consideration, Carr would make recommendations about individual teachers to Baule, who would in turn make recommendations to the Board.

When the time came for consideration of Green's retention at the school for 2007-2008, Carr recommended Green for renewal, and Baule submitted Green's name on the list of the probationary teachers he recommended for renewal at the Board's March 13, 2007, meeting. At a closed session of that meeting, the Board discussed each teacher on Baule's list. The meeting was not recorded, but attendees reported on the topics of discussion involving Green. Concerns about Green's performance as a math teacher were raised and discussed, and included the following: 1) the seemingly large number of students who had transferred out of Green's classes; 2) Green's method of disciplining students by isolating them from the rest of the class by the use of a file cabinet; 3) Green's inability to reach average to below average students in class; and 4) Green's lack of availability to meet with parents and students before and after class.

The Board directed Baule to investigate the number of students who requested to transfer out of Green's class and report back at a meeting the following week. At that meeting, Baule reported that 18 students had requested transfers out of Green's classes.

Baule informed the Board that he was no longer recommending renewal, and the Board voted not to allow Green to return to Westmont the following year. Thirteen other teachers' contracts were not renewed. The number had originally been 14, but one teacher, Sarah Jakalski, resigned prior to the meeting after having been told that her contract would not be renewed. The decision not to renew her contract was made in advance of the March 20 meeting, and her resignation preceded it as well. Jakalski is white. Green's classes were taken over by Dale Koepnick, who is also white.

On September 11, 2007, Green filed suit against the Board for violation of 42 U.S.C. §§ 1981 and 1983. The Board now moves for summary judgment on both counts of the complaint.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the

nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. Proc. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

With these principles in mind, we turn to the Board's motion.

## DISCUSSION

As stated earlier, Green's complaint contains two counts: one under 42 U.S.C. § 1981 and one under 42 U.S.C. § 1983. The assertions of the § 1983 count indicate that Green's theory of liability is grounded in an equal protection claim for the same treatment at issue in his § 1981 claim, and he does not provide any argument in support of § 1983 liability separate from that for his § 1981 claim. Accordingly, we do not analyze his § 1983 claim separately.

In pertinent part, § 1981(a) states that "All persons within the jurisdiction of the United States shall have the same right...to make and enforce contracts...as is enjoyed by white citizens." In an employment context, § 1981 claims are analyzed under the same structure as is used for Title VII race discrimination claims. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Plaintiffs asserting that they were

subjected to discrimination can proceed under either the direct or the indirect method. *de la Rama v. Illinois Dept. of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008).

Both parties have set out their arguments using the familiar burden-shifting approach used for the indirect method. *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). In this framework, Green must first establish a prima facie case of racial discrimination by demonstrating that he is a member of a protected class, that he was meeting his employer's legitimate performance expectations, that he suffered an adverse employment action, and that other similarly situated employees who were not members of a protected class were treated more favorably. *Fane*, 480 F.3d at 538. If Green successfully establishes a prima facie case, the burden then shifts to the Board to present a legitimate nondiscriminatory reason for not renewing Green's contract. *Grimm v. Alro Steel Corp.*, 410 F.3d 383, 385 (7th Cir. 2005). If the Board meets this burden, then Green must show why a reasonable fact finder could find that the stated reason is pretextual. *Id.*

There is no dispute that Green is a member of a protected class or that an adverse employment action was taken against him. Instead, the focus rests on the second and fourth elements. The Board first contends that Green was not displaying the attributes they expected from teachers in the District in that he employed a disciplinary technique that was not acceptable under District policy, he was not available to help students

outside of class, he told students they were stupid, and an unusually large number of students had transferred out of his classroom. Green does not dispute that teachers are expected to use acceptable disciplinary techniques, to refrain from using degrading language toward students, to be available to assist students with subject material outside of class, and to maintain stability in classroom numbers and composition.

Instead, he argues that he was performing satisfactorily in all of these areas. According to Green, he stopped using the offending disciplinary practice well before the Board meetings and before Baule changed his mind on whether to recommend his contract be renewed. He insists that, though he was not available every day and had demands on his time from his second job, he did meet with students outside of class. On the final point, Green does not dispute that at least 15 students transferred out of his class over the 2006-2007 school year; he counters only that the Board should have inquired further into the reasons for the transfers rather than looking only at the raw numbers.

These issues go to more than resolution of what actually took place during Green's year at Westmont, as each was also a point raised during the closed meeting where renewals were considered. To defeat summary judgment, Green must therefore show not just that none of these problems existed but that the Board's belief that they did was pretextual. Our examination is limited to whether the Board honestly believed

that Green's performance came up short in all of these ways, even if that belief was incorrect. *See Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986).

Over the course of the 2006-2007 school year, at least 15 students transferred out of Green's classes, including children of Cathy Casey and Linda Kelly, two of the seven members of the Board; there had never been more than two or three requests in the past. Casey met with Carr in December and expressed concerns abut Green's availability outside of the classroom and his treatment of the students. Specifically, she complained that her daughter sought help from Green before and after school only to find that he was unavailable. School policy requires teachers to be available to students outside of class time. Green did not stay after school five days a week, though he did offer to tutor students before and after school.

In addition to the transfer out evidence, the record also establishes the following on the subject of Green's imposition of discipline. Green disciplined disruptive students by separating them from the rest of the class by a file cabinet. A student seated behind the cabinet could observe the teacher and the blackboard but would have difficulty seeing his or her classmates. Casey was aware of Green's use of the divider through her daughter, who had also told her that Green called students "stupid" in class. The District has a written policy regarding student discipline, which provides that methods that may be "damaging to students, such as ridicule, sarcasm, or excessive temper

displays" were not to be used in the classroom. Carr, finding Green's practice contrary to this provision, instructed Green to stop using the divider, and after a second discussion on the matter, Green complied.

Green was contemporaneously employed by IBM while he worked at Westmont. He periodically conducted business for that job on a laptop and cell phone during class time when he thought students were engaged in another activity. Other teachers and administrators observed these activities, but he was not instructed to cease them or informed that he could not be employed outside the school. Nevertheless, Green admits that he was not available every day due to demands on his time from his second job, and complaints about his unavailability are manifestly part of the record.

Green's challenge to the veracity of the Board's belief reiterates his position that the specific problems did not in fact exist. These attacks pertain not to the honesty of the Board's belief that Green was not a good candidate for renewal but to whether the Board made a good decision. The latter is a question outside the scope of this court's oversight; without a showing of pretext, summary judgment is warranted. *Fane*, 480 F.3d at 541.

The Board also contends that there is no evidence of a similarly situated white employee who received more favorable treatment than Green. The analysis of whether an employee comparator can be considered similarly situated to a plaintiff is not rigid;

it must be guided by common sense. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Green contends that Koepnick, his replacement, and Jakalski, the teacher who resigned her position provide meaningful comparisons.

According to Green, Koepnick received more favorable treatment than he in that his contract was renewed beyond his first year. Prior to coming to Westmont, Koepnick had no teaching experience. During each of the two semesters of Koepnick's first year of teaching, his performance was rated "Satisfactory."

Koepnick does not provide a meaningful point of comparison for two reasons. First, the respective renewal decisions did not take place at the same time or within reasonable proximity. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 645 (7th Cir. 2006). Moreover, Green does not provide any information on Koepnick's performance in the areas where the Board perceived he was not passing muster. Common sense dictates that significant differences in employees' respective employment histories will prevent them from being considered similarly situated. *Humphries*, 474 F.3d at 405. Without information on the transfer rate in Koepnick's classroom, his availability outside of class, his disciplinary practices, his conduct in the classroom, and his ability to help slower students progress, the simple fact that his contract was renewed cannot be deemed more favorable treatment than what Green received.

With regard to Jakalski, Green contends that, though her contract was also not renewed, she received more favorable treatment in that she was informed of the nonrenewal before the Board meeting, permitting her to resign instead. His position ignores the fact that the decision not to renew Jakalski's contract was made in advance of the Board's consideration of Baule's recommendations. In Green's situation, by contrast, the Board asked Baule to investigate further into his situation at the initial meeting, and his recommendation for nonrenewal was not reported to them until March 20. Because the final decision as to nonrenewal was made in advance of the meeting for Jakalski but not for Green, there is no meaningful comparison to be made from the differing treatment they received.

## CONCLUSION

Based on the foregoing, the motion for summary judgment is granted.

_____
Charles P. Kocoras
United States District Judge

Dated:  December 16, 2008